Robert B. Owens, Esq. (Bar No. 77671)
rowens@ogrlaw.com
OWENS & GACH RAY
269 S. Beverly Drive, #1074
Beverly Hills, CA 90212
Ph: (310) 553-6611
Fax: (310) 954-9191

Gene Markin, Esq.
gmarkin@stark-stark.com
STARK & STARK, P.C.
993 Lenox Drive, Bldg. Two
Lawrenceville, NJ 08648
Ph: (609) 895-7248
Fax: (609) 895-7395
*Admitted Pro Hac Vice*

*Attorneys for Plaintiff*
*Living Vehicle, Inc.*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LIVING VEHICLE, INC., | Case No. 2:22-cv-06226-RGK (ASx) |
| Plaintiff, | **PLAINTIFF LIVING VEHICLE, INC.'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |
| vs. | |
| MEGAN KELLEY aka MEGAN GRAHAM and JEFF ROBINSON, | **Date: December 12, 2022** |
| Defendants. | **Time: 9:00 a.m.** |
| | **Courtroom: 850** |
| | **Judge: Honorable R. Gary Klausner** |

# TABLE OF CONTENTS

**Page**

Summary of Motion……………………………………………………………………… 1

Factual Support………………………………………………………………….. 1

Legal Argument………………………………………………………………….. 8

I.  Plaintiff Has Demonstrated A Likelihood of Success On The Merits…………………………... 9

  A.  Defendants Have Published Defamatory And Provably Untrue Statements About Living 4

Vehicle And Its Trailers………………………………………………………………..…………. 9

  B.  Defendants Are Liable For Business Disparagement And Trial Libel………………………... 14

  C.  Defendants Have Breached Confidentiality………………………………..………………….. 16

II. Plaintiff Has Suffered And Stands To Suffer Irreparable Harm If A Preliminary Injunction Is 9

Not Issued ……………..………………………………………………………...………..... 17

III. Balance Of The Equities Tips In Plaintiff's Favor……………………………………………..….. 18

IV. Injunctive Relief Is In The Public Interest……………………………………………………….. 19

V.  Relief Requested………………………………………………..……………………………….. 20

Conclusion……………………………………………………………………………….. 20

# TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page**

*Aetna Cas. & Sur. Co. v. Centennial Ins. Co.*, 838 F.2d 346, 351 (9th Cir. 1988)………………    15

*Am. Bullion, Inc. v. Regal Assets, LLC*, No. CV 14-01873 DDP (ASx),

     2014 U.S. Dist. LEXIS 161082, at *12-13 (C.D. Cal. Nov. 17, 2014)……………………    17

*Arc of California v. Douglas*, 757 F.3d 975, 983 (9th Cir. 2014)…………………………………    9

*Aviation Consumer Action Project v. Washburn*, 535 F.2d 101, 108 (D.C.Cir.1976)…………..    20

*Barnes-Hind v. Superior Court*, 181 Cal. App. 3d 377, 382 (1986)……………………………..    10

*Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)…………………………………………………..    20

*Erlich v. Etner*, 224 Cal. App. 2d 69, 73, 36 Cal. Rptr. 256 (1964)…………………………......    14

*Herb Reed Enterprises, LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013)…    17

*Isuzu Motors Ltd. v. Consumers Union of U.S., Inc.*, 66 F. Supp. 2d 1117,

     1122 (C.D. Cal. 1999)………………………………………………………………………..    9

*Johnson v. Cal. State Bd. of Accountancy*, 72 F.3d 1427, 1430 (9th Cir. 1995)…………………    9

*Kaneka Corp. v. Xiamen Kingdomway Grp. Co.*, No. 2:11-CV-02389-MRP-SS,

     2014 WL 12577150, at *2 (C.D. Cal. Feb. 24, 2014)…………………………………………    14

*Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991)…………………    20

*League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*,

     752 F.3d 755, 766 (9th Cir. 2014)……………………………………………………………    19

*Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Trust*,

     636 F.3d 1150, 1160 (9th Cir. 2011)…………………………………………………………    17

*Pimentel v. Dreyfus*, 670 F.3d 1096, 1105-06 (9th Cir. 2012)…………………………………...    9

*POM Wonderful LLC v. Purely Juice, Inc.*, No.: CV-07-02633 CAS (JWJx), 2008 U.S. Dist.

     LEXIS 55426, 2008 WL 4222045, at *16 (July 17, 2008)………….....………………………    19

*Price v. Stossel*, 620 F.3d 992, 998 (9th Cir. 2010)………………………………………………    9

*Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988)……………………    9

*Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)………………………………..    8

**<u>Statutes and Other Authorities</u>**

Cal. Civ. Code §44……………………………………………………………………….   10

Cal. Civ. Code §45……………………………………………………………………….   10

DEFENDANT MARIBETH ANNAGUEY'S NOTICE OF MOTION AND MOTION TO DISMISS FIRST AMENDED COMPLAINT;
MEMORANDUM OF POINTS AND AUTHORITIES

## SUMMARY OF MOTION

1.      Plaintiff Living Vehicle, Inc. ("**Living Vehicle**" or "**LV**") needs to stop the dissemination of false, misleading, and reputationally-harmful statements about the presence of toxic levels of volatile organic compounds (VOCs), formaldehyde, and dangerous gases inside its expensive trailer units and is not looking to limit anyone's right to free speech or to prohibit the sharing of personal experiences or opinions about its luxury trailer products.   As such, Living Vehicle seeks a preliminary injunction enjoining Defendants Megan Kelley aka Megan Graham ("**Graham**") and Jeff Robinson ("**Robinson**") from continuing to promulgate and publish disparaging statements and falsehoods about Living Vehicle and its trailers.  Moreover, Living Vehicle seeks an Order directing Defendants to remove all online posts, videos, and comments containing such false and intentionally disparaging statements.

## FACTUAL SUPPORT

2.      Living Vehicle is an acclaimed designer and distributor of high-end luxury full-time living and off-grid capable trailers.   An industry disruptor, Living Vehicle combines luxury, simplicity, quality, and utility in offering an innovative electric travel trailer product that has been featured in *Business Insider*, *MotorTrend*, *Architectural Digest*, and *Travel + Leisure*.

3.      In September 2021, Defendant Graham contacted Living Vehicle requesting information about LV trailers.  *See* Declaration of Joanna Hofmann (the "Joanna Decl."), ¶¶ 3-4.  During the initial exchange, Graham indicated she was a hair colorist and therefore was not "chemically sensitive" and could "tolerate chemicals more than most," but nevertheless inquired about VOCs given her prior experience with mold exposure.  *See* Joanna Decl., ¶¶ 5-6.   Living Vehicle told Graham that while the trailers were not guaranteed "VOC free," they were "low VOC."  *Id*., ¶ 5.

4.      In October 2021, Graham and her husband Robinson came to visit LV's headquarters in Santa Barbara, CA to tour the trailers and to produce a vlog (video blog) about their trip and Living Vehicle.  *Id*., ¶¶ 7-8.

5.      Over the next few months, Defendants decided to purchase an LV trailer and signed a purchase agreement in February 2022.  *Id*., ¶ 20; *see also* Declaration of Matthew Hofmann (the "Matthew Decl."), ¶ 14.  In June 2022, Defendant Robinson signed an NDA and Defendants came to Santa Barbara to take delivery of their new 2022 Living Vehicle PRO-EV trailer (the "**Trailer**" or "**LV Trailer**").  *See* Matthew Decl., ¶¶ 14-18. Defendants spent several hours in and around their LV Trailer, making sure everything worked, asking questions, and creating a punch list of minor items to address.  *Id*., ¶ 18; *see also* Joanna Decl., ¶ 30.  At no point did Defendants express a concern about the air quality inside the trailer, mention either of them had noticed any type of smell, had a headache, felt nauseous or dizzy, or had any other type of adverse reaction to being inside the Trailer.  *See* Matthew Decl., ¶¶ 18-19; *see also* Joanna Decl., ¶ 31.  In fact, Matthew Hofmann specifically asked Graham whether she had any sensitivity issues to the indoor Trailer environment to which she replied "no" and indicated she was very happy with the new Trailer.  *See* Matthew Decl., ¶ 20.

6.      On July 15, 2022, Robinson informed LV that because Graham had tested positive for COVID-19 they would not be able to do the new trailer orientation and asked to reschedule.  *Id*., ¶ 41.  He did not say anything about Graham going to the hospital, getting sick after sleeping in the Trailer, or made any comments to suggest there was a problem with the Trailer.  *Ibid*.  But then on July 17, 2022, without warning, notice, or discussion with LV, Graham posted a video on Instagram saying she had to be rushed to the emergency after sleeping in the Trailer one night the week prior because she became violently ill, suspects "formaldehyde poisoning", and is getting the Trailer tested.  *Id*., ¶¶ 39, 42.  Graham also commented and posted that the entire Trailer smelled "like glue," she could not go inside because her kidneys and liver were really struggling, and that Robinson gets an instant headache when he goes inside the Trailer.  *Id*., ¶ 43.

7.      In related posts and videos, Graham stated that inside the Trailer had "very very high VOC levels and very very high formaldehyde" despite it being advertised as low VOC and healthy.  *Id*., ¶ 47.  Graham further stated that her "brand new solar travel trailer"

had "extremely high VOCs," "is full of formaldehyde," and promised to publish the air quality results she received to make sure "no one else gets sick as I did." *Id.*, ¶ 49.  Graham also asserted that the Trailer was "far from clean, safe and low VOC" and that neither she nor Robinson could step inside the Trailer without "getting dizzy and nauseas".  *Ibid.* Graham further claimed she was still throwing up several times a day and may have "permanent organ damage" from the $640,000 Trailer.  *Id.*, ¶ 50.

8.    On July 19, 2022, Graham continued posting social media videos and commentary claiming to have become sick from "formaldehyde from our solar travel trailer" and accusing LV of lying about its trailers being low VOC because the exterior panels of the trailers are bonded using "toxic 3M tape." *Id.*, ¶ 51.

9.    Because LV intentionally designed its trailers to use low VOC materials and to emit as few irritants as possible, LV's CEO and Co-Founder, Matthew Hoffman ("Matthew") was very surprised by Defendants' allegations and sought to immediately investigate, even if that meant flying out to New Hampshire to personally oversee inspections and remediation. *See* Matthew Decl., ¶¶ 33-36.  Matthew asked Robinson for the testing results as well as access to the Trailer so LV could send out an independent testing agency "to understand exactly what is going on and determine what is causing this." *Id.*, ¶ 36.

10.   On August 1, 2022, LV transmitted to Defendants' attorney a draft settlement agreement that was marked "CONFIDENTIAL."  *See* Declaration of Gene Markin, Esq. (the "Markin Decl."), ¶¶ 7-8; *see also* Exhibit B to the Markin Decl.  The draft confidential settlement agreement contained various provisions and sections, including a mechanism for LV taking back Defendants' Trailer and providing Defendants a full refund less any repair costs incurred due to Defendants' use of the Trailer.  *See* Markin Decl., ¶ 9.  The draft settlement agreement contained mutual releases, indemnification clauses, confidentiality, liquidated damages for breach of confidentiality, provisions for the take down and removal of any social media posts or online statements made by Defendants concerning or involving Living Vehicle (good or bad), and a closing statement by which Defendants would

acknowledge that the LV trailer did not cause any of their health problems. *Id.*, ¶¶ 10-13.

11.     Defendants never responded to the settlement proposal, never provided a counter proposal, and did not request any changes to the draft settlement agreement. *Id.*, ¶ 15. Rather than attempt to negotiate a resolution and put the matter to rest, Defendants took to social media to disparage and spread more lies about Living Vehicle. *See* Joanna Decl., ¶¶ 59-101.

12.     On August 1, 2022, Graham posted a picture on Instagram of her face claiming the inflammation was caused by the air quality in her LV Trailer, stated that "methyl butane and pentane exposure is dangerous," and made it a point to say that people who could afford to buy an LV trailer would not "after they see the air quality results." *Id.*, ¶ 59. The same day Graham posted a negative review on LV's Facebook page saying she had to go to the emergency room with "severe vomiting and a massive crushing headache" after spending one night in the Trailer. *Id.*, ¶ 60.

13.     Graham further stated that Robinson "could not spend time in the Living Vehicle 2022 without getting dizzy, sick to his stomach and having a pounding headache." *Ibid.* Graham went on to say she had the air quality inside the Trailer tested and came back showing the pentane, methyl butane, and total VOCs "were severe" and "formaldehyde and carbon Monoxide were all elevated." *Ibid.* She proclaimed that she and Robinson were not able to enter the LV trailer "without a respirator." *Ibid.*

14.     The next day, Graham posted an Instagram video making similar untrue and false statements. *Id.*, ¶¶ 65-66. Most notable, Graham declared "**I think it will be the last travel trailer they sell and that's enough for me**" evidencing her intent to cause damage to Living Vehicle and to dissuade customers from purchasing LV trailers. *Id.*, ¶ 65. In similar social media videos and posts that were published around the same time, Graham talks about how severe the chemical exposure has been after spending time in the Trailer and musing that the silver lining is that she can present "the facts so that other people don't get exposed to this." *Id.*, ¶ 68. Graham used the hashtags #santabarbara #traveltrailer #custom #livingvehicle #luxuryunplugged (jk) to identify Living Vehicle and make sure

anyone searching for #livingvehicle, LV's name, brand, and registered trademark, would see her frivolous and damaging posts. *Id.*, ¶ 69.

15.    In her Instagram stories, Graham proclaimed "there was **a lot of methyl butane and pentane in the air quality which is really really dangerous** also **high levels of formaldehyde** and **super super high levels of VOCs**." *Id.*, ¶ 70. She further stated that no one should buy a vehicle from LV ever again after seeing the air test quality results and the "true facts" she will present in an upcoming YouTube video. *Ibid.* Graham also posted the cover page of the IndoorDoctor report showing the air quality results from her "#livingvehicle travel trailer," accused LV of misrepresenting its trailers as "low VOC," and suggested that the LV Trailer caused symptoms attributable to high VOC exposure, including "irritation of the lungs, as well as damage to the liver, kidney, or central nervous system." *Id.*, ¶ 71.

16.    On August 3, 2022, Graham posted a lengthy YouTube video on her YouTube account, which has nearly 14,500 subscribers, recounting her experience with the LV Trailer, discussing how sick she became after spending a night in the Trailer, and attributing her symptoms and sickness to severe formaldehyde and VOC levels inside the LV Trailer based on the air quality lab testing results she had received. *Id.*, ¶¶ 78, 89.

17.    In the description accompanying and introducing the YouTube video, Graham wrote "I had an **exposure to severe TVOCs (total voc levels) in our new Living Vehicle Travel Trailer**.  It was sold to us as healthy, and using materials that are low in VOCs so we were shocked." *Id.*, ¶ 88 (emphasis added).  Graham's video received more than 1,100 views and is still accessible on YouTube. *Id.*, ¶ 89.

18.    In a related YouTube video, which received nearly 1,900 views, and accompanying commentary Graham again proclaims that the LV Trailer had "severe VOC levels," was "not the low VOC unit" they were promised, and that Living Vehicle has "refused to give them a refund and take back the trailer." *Id.*, ¶¶ 91-96.  This video contains many of the same false statements and lies about the air quality inside the LV Trailer as well as reveals confidential information contained in the draft settlement agreement.  *Id.*, ¶¶

92-95; *see also* Exhibit L to the Joanna Declaration.

19.     On or about August 7, 2022, Robinson posted a comment on an article posted on www.rvtravel.com, which provided a review of Living Vehicle, stating the LV Trailer he purchased was not as advertised, had severe levels of VOCs which caused sore throats, nausea and headaches, LV has not wanted to provide a full refund and to take back the trailer, and LV wants him to stop talking about it.  *See* Joanna Decl., ¶ 100.

20.     On August 23, 2022, LV's environmental expert, Robert Leighton from J.S. Held, issued a rebuttal report demonstrating and explaining that all the reported VOC, formaldehyde, gas, and particulate matter levels contained in the IndoorDoctor and Enthalpy reports pertaining to the air quality inside Defendants' Trailer were **very low**, **completely normal**, and **well below established and accepted exposure limits and toxicity thresholds**.  *See* Declaration of Robert Leighton (the "Leighton Decl."), ¶¶ 9-26; *see also* Exhibit B to the Leighton Decl.

21.     Leighton analyzed Defendants' air quality results and compared the reported levels to applicable exposure limits and toxicity thresholds.  *See* VOC Test Results Comparison Table, Exhibit B to the Leighton Decl., at pp. 14-15.  Leighton concluded and illustrated that none of the reported levels came close to being toxic or dangerous and do not have the propensity to cause any adverse health effects since all the reported levels were all in line with what one would expect in a small, safe habitable space.  *Id*., ¶¶ 24-28.

22.     Notably, Leighton points out that the IndoorDoctor report does not determine or conclude that any of the reported levels are harmful or dangerous, rather it simply compares them to results obtained from other customers.  *Id*., ¶¶ 29-30, 36.

23.     With respect to individual results for pentane and methyl butane, which Graham has asserted to the public are "very high" and "harmful," Leighton explains how the reported amount of both VOCs is 10,000 times less than the exposure limit prescribed by the National Institute of Occupational Safety and Health (NIOSH), which is the threshold where exposure to the substances can have adverse health effects.  *Id*., ¶¶ 63-64, 66, 68-70.

24.    Leighton reached the same conclusion with respect to the reported levels of formaldehyde and carbon monoxide gas – determining both were very low and well within normal ranges, and stating it would be a falsehood to describe the formaldehyde and carbon monoxide found in the Trailer to be high, elevated, above normal, or in any way dangerous or toxic. *Id.*, ¶¶ 71-73, 77-78.

25.    On August 23, 2022, Living Vehicle forwarded a copy of Leighton's reports, conclusions, findings, and opinions to Defendants' counsel, summarized his findings, and again demanded Defendants cease making false and disparaging statements about LV and its products, retract their prior untrue statements, and take down and remove any posts, comments, and videos containing false and disparaging statements. *See* Markin Decl., ¶ 22. Defendants refused to comply and continued maliciously disseminating and promulgating harmful lies, untruths, and defamatory statements presented as "facts." *Id.*, ¶¶ 23-24. Defendants have also not responded to Living Vehicle's multiple requests to access the Trailer, conduct independent investigations, and evaluate the Trailer conditions. *Id.*, ¶ 26.

26.    To confirm its assertions that the LV trailers are low VOC and do not emit harmful VOCs or gases, Living Vehicle asked J.S. Held to test two new trailers, which are the same model trailer purchased by Defendants and built with exactly the same materials by the same manufacturer. *See* Matthew Decl., ¶¶ 78-80; *see also* Leighton Decl., ¶¶ 79. The results of that testing are contained in an Indoor Air Quality Assessment report prepared by Robert Leighton. *See* Exhibit C to the Leighton Decl. After reviewing and evaluating the test results, Leighton concluded that the few VOCs detected in the trailers were at extremely low levels, there was no detectable formaldehyde, gas levels were all within normal range, there was no active mold, and particulate matter levels were completely normal. *Id.*, ¶ 92.

27.    Yet, despite this conclusive evidence and the absolute dearth of any competent evidence supporting Defendants' frivolous claims, Defendants have refused to stop spreading lies and to retract their disparaging and untrue statements. *See* Markin Decl., ¶¶ 24-25. Consequently, Defendants' defamatory public statements have caused and continue

to cause irreparable harm to Living Vehicle by and through loss of reputation, loss of business, loss of customers, brand damage, negative commentary and reviews, and altered consumer perception.  *See* Joanna Decl., ¶¶ 64, 90, 97, 99, 101, 106; *see also* Matthew Decl., ¶¶ 55-71.

28.　Graham has admitted that many of her viewers, followers, clients, and friends make purchasing decisions, including large luxury purchases like Living Vehicle trailers, based on her recommendations and opinions; and many of the social media comments as well as actual customer anecdotes demonstrate that Defendants' malicious posts and mistruths have affected prospective customers' perception of Living Vehicle, their desire to purchase a Living Vehicle trailer, and the level of engagement the public has with Living Vehicle, which has been wrongly and unjustly portrayed by Defendants as a "bad company" that turned its back on its customers who received a defective and harmful travel trailer.  *See* Joanna Decl., ¶¶ 73, 86; *see also* Matthew Decl., ¶¶ 62-71.

29.　Defendants have acted knowingly and with intent to harm Living Vehicle as evidenced by Graham's posts and comments dissuading others from buying an LV trailer, making sure that the LV Trailer "will be the last travel trailer they sell," and publishing the test results to make sure "no one else gets sick as I did."  *See* Joanna Decl., ¶¶ 49, 59, 65-66, 68, 70, 72, 87.

## **LEGAL ARGUMENT**

30.　Injunctive relief is "an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) (quoting *Winter*, 555 U.S. at 20).

31.　Alternatively, a preliminary injunction may issue where "serious questions going to the merits were raised and the balance of hardships tips sharply in plaintiff's

favor," if the plaintiff "also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Id*. at 1135. This reflects the Ninth Circuit's "sliding scale" approach, in which "the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." *Id*.; *see also Arc of California v. Douglas*, 757 F.3d 975, 983 (9th Cir. 2014). In all cases, as an "irreducible minimum," the party seeking an injunction "must demonstrate a fair chance of success on the merits, or questions serious enough to require litigation." *Pimentel v. Dreyfus*, 670 F.3d 1096, 1105-06 (9th Cir. 2012) (internal quotation and citation omitted).

32.    Here, Defendants' provably false, disparaging, and defamatory public statements warrant an injunction to prevent and preclude further irreparable harm to Living Vehicle, its brand and reputation.

## I.    PLAINTIFF HAS DEMONSTRATED A LIKELIHOOD OF SUCCESS ON THE MERITS

33.    "[T]he test for a preliminary injunction is 'probable success on the merits' or 'fair chance of success on the merits.'" *Johnson v. Cal. State Bd. of Accountancy*, 72 F.3d 1427, 1430 (9th Cir. 1995) (internal citations omitted); *see also Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988) (finding that probable success equates to a showing of "a fair chance of success").

34.    Plaintiff has provided ample evidence and support to show it has a probable or fair chance of proving *defamation*, *trade libel*, and *breach of confidentiality*.

### A.    DEFENDANTS HAVE PUBLISHED DEFAMATORY AND PROVABLY UNTRUE STATEMENTS ABOUT LIVING VEHICLE AND ITS TRAILERS

35.    Under California law, "[t]he tort of defamation exists whenever a false and unprivileged statement which has a natural tendency to injure or which causes special damage is communicated to one or more persons who understand its defamatory meaning and its application to the injured party." *Isuzu Motors Ltd. v. Consumers Union of U.S., Inc.*, 66 F. Supp. 2d 1117, 1122 (C.D. Cal. 1999) (internal quotation omitted); *see also Price v. Stossel*, 620 F.3d 992, 998 (9th Cir. 2010) ("Under California law, defamation

involves the intentional publication of a statement of fact which is false, unprivileged, and has a natural tendency to injure or which causes specific damage.").

36. Defamation is effected by libel or slander. Cal. Civ. Code § 44. "Libel is a false and unprivileged publication by writing . . . which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation." Cal. Civ. Code § 45. Libel per se excludes the need to prove special damages: "[Damage] to Plaintiff's reputation is conclusively presumed and he need not introduce any evidence of actual damages in order to obtain or sustain an award of damages including, in an appropriate case, punitive damages." *Barnes-Hind v. Superior Court*, 181 Cal. App. 3d 377, 382 (1986).

37. Starting on and since July 17, 2022, Defendants have posted, published, and promulgated false and libelous statements and assertions of objective fact about Living Vehicle and the LV Trailer they purchased.  Specifically, Defendants have made the following false statements and assertions:

- The LV Trailer has "**very very high VOC levels** and **very very high formaldehyde**" despite it being advertised as low VOC and healthy.  *See* Joanna Decl., ¶ 47; *see also* Exhibit D to the Joanna Decl.
- The LV Trailer had "**extremely high VOCs**" and "is **full of formaldehyde**." *See* Joanna Decl., ¶ 47.
- Defendants cannot step foot inside the trailer without "getting dizzy and nauseas". *Id.*, ¶ 49
- Graham became sick from "formaldehyde" in the LV Trailer.  *Id.*, ¶ 51; *see also* Exhibit M to the Joanna Decl.
- LV lied and is "**lying**" about its trailers being low VOC and knows its trailers are "**toxic**." *Id.*, ¶¶ 51, 55-57; *see also* Exhibit E to the Joanna Decl.
- The LV Trailer is full of harmful VOCs and formaldehyde, which made Graham "so sick." *Ibid*.
- Living Vehicle used "**toxic 3M tape**" to bond the Trailer together. *Ibid*.
- Inflammation on Graham's face was caused by the air quality inside the Trailer noting that "methyl butane and pentane exposure is dangerous." *See* Joanna Decl., ¶¶ 59, 63; *see also* Exhibit F to the Joanna Decl.

10

- The pentane, methyl butane, and total VOC levels inside the Trailer "were **severe**" and "formaldehyde and carbon Monoxide were all **elevated**." *See* Joanna Decl., ¶ 60; *see also* https://www.facebook.com/livingvehicle/reviews.
- Defendants are not able to enter the LV Trailer "without a respirator." *Ibid.*
- Professional testing results showed that the Chemical Levels inside the Trailer were "***Severe***," Formaldehyde levels were "***Elevated***," Relative Humidity was "***Elevated***," and Total VOCs were "***Severe***." *Id.*, ¶¶ 61-62.
- The air quality inside the LV Trailer "is s**uper unhealthy with lots of pentane and methyl butane**." *Id.*, ¶¶ 65-66; *see also* Exhibit G to the Joanna Decl.
- LV "doesn't want to take [the Trailer] back." *Ibid.*
- Robinson "can't go into [the Trailer] without a respirator on." *Ibid.*
- LV provide Defendants "with an **uninhabitable vehicle**." *Ibid.*
- LV "know[s] that their vehicle is **unsafe**." *Ibid.*
- "One would never know from looking at the pictures of the beautiful interior, about the painting [pentane], methylbutane and Formaldehyde lurking beneath the surface." *Ibid.*
- Graham is presenting the "**the facts** so that other people don't get exposed to this." *See* Joanna Decl., ¶¶ 68, 70.
- Inside the Trailer "there was **a lot of methyl butane and pentane in the air quality which is really really dangerous** also **high levels of formaldehyde** and **super super high levels of VOCs**." *Id.*, ¶ 70; *see also* Exhibit I to the Joanna Decl.
- LV misrepresented its trailers as "low VOC" and suggesting that the LV Trailer caused symptoms attributable to high VOC exposure, including "irritation of the lungs, as well as damage to the liver, kidney, or central nervous system." *See* Joanna Decl., ¶ 71.
- Air quality test results for the Trailer showed high methyl butane, pentane, total VOCs "were **off the charts**," and high levels of formaldehyde and carbon monoxide. *Id.*, ¶ 72; *see also* Exhibit J to the Joanna Decl.
- Living Vehicle has not wanted to let Defendants return the Trailer and try to figure out what is wrong so "they don't hurt other people." *Ibid.*
- Living Vehicle "has **not wanted to take back the unit**." *See* Joanna Decl., ¶ 73.
- Living Vehicle did not do the right thing by taking the Trailer back and trying to figure out what was wrong after the LV Trailer exposed Graham to "**severe VOCs**." *Id.*, ¶¶ 77, 89.
- The total VOC levels inside the Trailer were "**severe**" and "**9 times the healthy levels**," there was "**actively growing mold**," there were "**high levels of dangerous methyl butane and pentane**," Graham's symptoms got a lot

worse from "**high VOC exposure from the Trailer**," the **VOCs in the Trailer sent Graham "to the hospital**," and the Trailer "did **not function as promised** and was **unsafe**." *Id*., ¶¶ 78-85; *see also* Exhibit K to the Joanna Decl.

- Graham "had an **exposure to severe TVOCs (total voc levels) in our new Living Vehicle Travel Trailer**.  It was sold to us as healthy, and using materials that are low in VOCs so we were shocked." *See* Joanna Decl., ¶ 88 (emphasis added).

- The LV Trailer had "**severe VOC levels**," was "**not the low VOC unit**" they were promised, and that Living Vehicle has "**refused** to give them a refund and take back the trailer." *Id*., ¶¶ 91-96; *see also* Exhibit L to the Joanna Decl.

- The LV Trailer is "full of **severe VOCs**." *Ibid.*

- The LV Trailer had "**elevated formaldehyde** … **notable levels of methyl butane and pentane both of which are super dangerous chemicals** … **above normal carbon monoxide** … MVOCs which have to do with microbial growth or mold were above normal and those will only be above normal if there **actively growing mold** …" *Ibid.*

- LV did not do the right thing and tried to bully, shame, threaten, and embarrass Graham into not talking about her experience.  *See* Exhibit L to the Joanna Decl., 16:30-17:30.

- "[E]ven being inside [the Trailer] for a small amount of time was **exposure to severe VOCs**."  See  https://www.megangrahambeauty.com/blog/living-vehicle-air-quality-findings (emphasis added).

- "Total Voc Levels were **severe**" inside the Trailer and there "were notable levels of Methyl Butane and Pentane, **elevated formaldehyde** (wow!) and **carbon Monoxide was higher than normal**.  Even MVOCS were moderate (**this indicated active mold growth**) it is **above normal**." *Ibid.*

- Inside the Trailer, "the VOCS were so severe that they were also negatively impacting Jeff to the point he could not spend time in the trailer.  **Having to wear a respirator at home is indicative of an issue**." *Ibid*. (emphasis in original).

- "But our low VOC trailer had high vocs." *Ibid.*

- "We actually purchased a Living vehicle 2022 and found it to be very different than as advertised.  It was advertised as being clean and healthy and using low VOC products and we actually felt very sick being inside of it so we decided to pay $850 to have the air quality tested.  As it turns out the **VOC levels were severe which explained a lot of why we were having sore throats, nausea, and headaches** … So far, **the company has not wanted to give us a full refund and take back the trailer**.  For approximately 630,000 we expected

12

the world class service the company spoke of … but instead **we have a trailer that we can't live in** … and the living vehicle company wants us to stop talking about it." *See* Joanna Decl., ¶ 100 (emphasis added).

38.     Each of these statements, presented as confirmed fact, is false, misleading, and defamatory since Defendants' own testing results showed that the air quality inside the LV Trailer is safe, non-toxic, neither dangerous nor harmful, and does not have high or elevated levels of VOCs, including pentane and methyl butane, formaldehyde, carbon monoxide, or particulate matter.  *Id*., ¶¶ 25-28, 52-54, 60-62, 66-94; *see also* Exhibits B & C to the Leighton Decl.   Not only did Defendants' testing indicate normal, non-toxic VOC, formaldehyde, and carbon monoxide levels, but Living Vehicle's own testing confirmed that its trailers are indeed low-VOC, safe, habitable, and qualify for LEEDS certification for environmentally friendly indoor air quality. *Ibid*.

39.     Moreover, Defendants' statements telling the public that Living Vehicle has not wanted to take the Trailer back, has done nothing to investigate the issue, and was not willing to issue a full refund are blatantly untrue and contradicted by the paper trail correspondence between LV and Defendants.  *See* Matthew Decl., ¶¶ 27-47; *see also* Markin Decl., ¶¶ 3-13, 18-20.   Despite numerous, repeated requests for access to Defendants' Trailer so LV could conduct its own testing and get to the bottom of the issue, Defendants never made the Trailer available to LV and instead falsely complained on social media that Living Vehicle was not doing anything to investigate their claims. *Ibid*.

40.     The statements are per se harmful and have a natural tendency to injure or cause special damage to Living Vehicle in the form of lost business, loss of reputation and brand image, and changed consumer perception.  Graham has openly boasted that her followers, viewers, and clients include prospective Living Vehicle customers and make purchase decisions (including expensive luxury items like LV trailers) based on her recommendations.  *See* Joanna Decl., ¶¶ 73, 86; *see also* Matthew Decl., ¶¶ 55-71.

41.     Defendants' defamatory statements, comments, and posts have certainly caused brand damage and business harm to Living Vehicle.  Customers under contract to

13

purchase LV trailers have referenced Graham's statements and expressed concern about moving forward with their purchase. *See* Matthew Decl., ¶¶ 55-62, 64-65. As a direct and primary result of Defendants' posts, people who have never done business with LV posted negative reviews saying LV lies "about VOCS" and sent LV messages criticizing LV for not refunding Graham for the trailer "with high Tvocs." *See* Joanna Decl., ¶¶ 64, 101.

42. Social media comments by people who watched Graham's videos and read her posts illustrate that people believe Graham's false statements, are dissuaded from purchasing a Living Vehicle trailer, view Living Vehicle in a negative light, and believe LV trailers to be unsafe and to emit toxic VOCs. *See* Joanna Decl., ¶¶ 90, 97, 99; *see also* Matthew Decl., ¶¶ 67-77. Moreover, Living Vehicle has noticed a significant decline in new inquiries since Defendants began posting and publishing their defamatory statements. *See* Matthew Decl., ¶ 63.

43. As such, Plaintiff has established the falsity of Defendants' public statements and illustrated the specific and general business harm and brand damage to Living Vehicle those statements have caused. Accordingly, Plaintiff has carried its burden in showing at least a fair chance of succeeding on its defamation claims.

**B. DEFENDANTS ARE LIABLE FOR BUSINESS DISPARAGEMENT AND TRADE LIBEL**

44. To prove business disparagement under California law, "a claimant must show that (1) the accused party made a statement disparaging the claimant's product, (2) the disparaging statement was couched as fact and not opinion, (3) the statement was false, (4) the statement was made with malice, and (5) the statement caused monetary loss." *Kaneka Corp. v. Xiamen Kingdomway Grp. Co*., No. 2:11-CV-02389-MRP-SS, 2014 WL 12577150, at *2 (C.D. Cal. Feb. 24, 2014) (citation omitted).

45. Trade libel is defined as "an intentional disparagement of the quality of property, which results in pecuniary damage." *Erlich v. Etner*, 224 Cal. App. 2d 69, 73, 36 Cal. Rptr. 256 (1964). "Disparagement" consists of "injurious falsehoods that interfere with business," and unlike the tort of defamation, is "not directed at the plaintiff's personal

reputation, but rather at the goods a plaintiff sells or the character of his other business." *Aetna Cas. & Sur. Co. v. Centennial Ins. Co*., 838 F.2d 346, 351 (9th Cir. 1988).

46.   As discussed in Section I.A. above, Defendants have made numerous false statements disparaging Plaintiff's travel solar trailer products, which were presented as facts not merely personal opinions, *i.e*., that LV trailers have high levels of dangerous VOCs, above normal levels of formaldehyde and carbon monoxide, are not safe, and caused Defendants to suffer immediate and severe health ailments such as headaches, nausea, throat and skin irritation, incessant vomiting, and potential organ damage. *See* Joanna Decl., ¶¶ 39, 42-51, 55-63, 65-98, 100.

47.   Defendants intentionally made these statements with the purpose of harming Living Vehicle and deterring customers away from considering or purchasing a Living Vehicle trailer.  In fact, Graham has explicitly stated she was sharing the air quality "test results" to inform others of the trailer hazard and to make sure no one else gets "exposed." See Joanna Decl., ¶¶ 59, 65-66, 68.  Moreover, even after Living Vehicle shared the uncontroverted rebuttal report of Robert Leighton discussing applicable toxicity standards and concluding that none of the reported VOC, formaldehyde, gas, or particulate matter levels detected in the LV Trailer were high, above normal, harmful, or cause for concern, Defendants nevertheless refused to remove disparaging content and continued spreading lies about Living Vehicle. *See* Markin Decl., ¶¶ 24-25.

48.   Defendants' disparaging statements have interfered with Living Vehicle's business and caused specific pecuniary harm.  One of Graham's followers posted a negative review of Living Vehicle on LV's Facebook page accusing LV of lying "about VOCs" and threatening buyers "who were hospitalized by their product" despite never having purchased an LV trailer or having had any type of business relationship with LV.  *See* Joanna Decl., ¶ 64.  One person who saw Graham's YouTube video commented that he and his wife "have been following and dreaming of life in a LV for the past few years," but now "[s]omething feels a bit fishy and I think you [Graham] may be opening up the curtain on what that is." *Id*., ¶ 97.

49.   One customer who was under contract to purchase an LV trailer contacted Living Vehicle with "concerns about moving forward" after seeing one of Graham's videos talking about the poor air quality inside the LV Trailer.  *See* Matthew Decl., ¶¶ 56-62.  It remains to be seen whether this customer will get cold feet and want out of the deal.

50.   Another prospective customer who was very interested in purchasing an LV trailer and who was planning on placing an order with Living Vehicle has not done so after seeing Graham's video review and becoming "deeply concerned" about the "severe VOCs" found inside her trailer as well as her statements that LV "would not acknowledge her concerns nor refund the vehicle or even compromise a solution." *Id.*, ¶¶ 65-66.  Losing the sale means losing hundreds of thousands of dollars in profit. *Id.*, ¶ 66.

51.   Consequently, Living Vehicle has established sufficient facts to likely prevail on its trade libel claims.

### C.   DEFENDANTS HAVE BREACHED CONFIDENTIALITY

52.   On June 9, 2022, Defendant Robinson signed a Non-Disclosure Agreement ("NDA") agreeing to keep confidential any information, including proposals, provided to him by or on behalf of LV pertaining to the trailer, LV, and LV's business.  *See* Matthew Decl., ¶ 16; *see also* Exhibit A to the Matthew Hofmann Decl.

53.   On August 1, 2022, by and through counsel, Living Vehicle forwarded a draft settlement agreement containing LV's proposal for settlement to Defendants.  See Markin Decl., ¶ 7.  The draft settlement agreement was conspicuously marked "CONFIDENTIAL" at the bottom of every page.  *Id.*, ¶ 8.  The draft agreement contained various proposed terms, including provisions for picking up and inspecting the Trailer, providing Defendants with a full refund less the cost of any damage to the Trailer caused by Defendants' use, removal of social media and online posts and comments about or concerning Living Vehicle, mutual releases, confidentiality, liquidated damages for breach of confidentiality, non-disparagement, and an acknowledgment of non-liability. *Id.*, ¶¶ 9-13.

54.   Despite the non-disclosure provisions of the NDA and the confidential nature of the draft settlement agreement, Defendants published, disclosed, and revealed specific

confidential information and draft provisions, including settlement terms, confidentiality and removal of posts, non-disparagement, liquidated damages, and acknowledgment of non-liability. *See* Joanna Decl., ¶¶ 78, 82, 95, 100.

55.     Accordingly, Defendants have breached confidentiality and Plaintiff is likely to succeed on its breach of confidentiality claims.

## II.     PLAINTIFF HAS SUFFERED AND STANDS TO SUFFER IRREPARABLE HARM IF A PRELIMINARY INJUNCTION IS NOT ISSUED

56.     "[T]he person or entity seeking injunctive relief must demonstrate that irreparable injury is likely in the absence of an injunction.  An injunction will not issue if the person or entity seeking injunctive relief shows a mere possibility of some remote future injury, or a conjectural or hypothetical injury." *Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Trust*, 636 F.3d 1150, 1160 (9th Cir. 2011) (quotations omitted).

57.     "Evidence of loss of control over business reputation and damage to goodwill could constitute irreparable harm." *Herb Reed Enterprises, LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013); *see also Am. Bullion, Inc. v. Regal Assets, LLC*, No. CV 14-01873 DDP (ASx), 2014 U.S. Dist. LEXIS 161082, at *12-13 (C.D. Cal. Nov. 17, 2014) (finding irreparable harm resulting from loss of business caused by false, bad online reviews).

58.     Here, the irreparable harm Living Vehicle has suffered and stands to suffer if injunctive relief is not granted is evident. Current and prospective customers have referenced Graham's reviews and public statements in communicating "concerns" about moving forward with Living Vehicle and potential customers have sympathized with Graham and declared they would not do business with Living Vehicle because of Graham's statements and assertions.  *See* Joanna Decl., ¶¶ 64, 90, 97, 99, 101, 106; *see also* Matthew Decl., ¶¶ 56-73.  Defendants' defamatory public statements have caused and continue to cause irreparable harm to Living Vehicle by and through loss of reputation, loss of business, loss of customers, brand damage, negative commentary and reviews, and altered

consumer perception.  *Ibid.*

59.     Graham has admitted that many of her viewers, followers, clients, and friends make purchasing decisions, including large luxury purchases like Living Vehicle trailers, based on her recommendations and opinions; and many of the social media comments as well as actual customer anecdotes demonstrate that Defendants' malicious posts and mistruths have affected prospective customers' perception of Living Vehicle, their desire to purchase a Living Vehicle trailer, and the level of engagement the public has with Living Vehicle, which has been wrongly and unjustly portrayed by Defendants as a "bad company" that turned its back on its customers who received a defective and harmful travel trailer.  *See* Joanna Decl., ¶¶ 73, 86; *see also* Matthew Decl., ¶¶ 63-72.

60.     Defendants' disparaging and defamatory statements have spooked customers with whom Living Vehicle was under contract or getting close to being under contract for the purchase of a new Living Vehicle trailer.  *See* Matthew Decl., ¶¶ 56-67.  Defendants' statements have caused people who have never done business with Living Vehicle to post a negative review on LV's Facebook page, write to LV and accuse it of selling a product with high TVOCs, and to repost Graham's video showing Robinson coming out of the LV Trailer with a gas mask.  *See* Joanna Decl., ¶¶ 64, 99, 101.

61.     Anyone who Googles "Living Vehicle trailer review" will see Graham's YouTube video review filled with misstatements and mistruths about LV trailers' indoor air quality and will likely immediately be turned off to Living Vehicle.  Moreover, the public comments to Graham's posts and videos show that her viewership is familiar with Living Vehicle and has changed their perception about Living Vehicle for the worse as a direct result of Graham's frivolous and defamatory claims.  *See* Joanna Decl., ¶¶ 90, 97.

62.     As such, Living Vehicle's reputation, brand image, and business goodwill has been damaged and will continue to be irreparably damaged should the Court decline to issue the requested injunction.

### III.    BALANCE OF THE EQUITIES TIPS IN PLAINTIFF'S FAVOR

63.     Courts must "balance the competing claims of injury and must consider the

18

effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24.   Here, absent injunctive relief, Living Vehicle will continue suffering irreparable harm to its business, brand image, and customer relationships caused by Defendants' false and defamatory public statements and social media posts and videos.

64.    Any prospective customer that researches Living Vehicle and looks for reviews online is bound to come across Graham's YouTube videos and be negatively impacted by the untrue statements about health hazards, high VOCs, and dangerous formaldehyde inside the trailers.   Living Vehicle has heard "concerns" from customers under contract to purchase Living Vehicle trailers about the indoor air quality due to Graham's public statements and posts.   Graham's followers have vowed to help her spread "the word" about Living Vehicle and to perpetuate the dissemination of false and disparaging statements about LV and its trailers.   As such, Living Vehicle is harmed every day that Defendants' posts remain online and accessible to the public.

65.    Conversely, there would be no prejudice or harm to Defendants if they were ordered to take down and remove all their social media and online posts about, concerning, or mentioning Living Vehicle.   *See POM Wonderful LLC v. Purely Juice, Inc.*, No.: CV-07-02633 CAS (JWJx), 2008 U.S. Dist. LEXIS 55426, 2008 WL 4222045, at *16 (July 17, 2008) (The potential harm to Defendants here seems to be limited, given they do not have a right to disseminate allegedly false statements).   It takes a few mouse clicks to remove and delete posts, videos, and online comments, and therefore, the balance of the equities favors the granting of injunctive relief.

### IV.    INJUNCTIVE RELIEF IS IN THE PUBLIC INTEREST

66.    "The public interest inquiry primarily addresses impact on non-parties rather than parties." *League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 766 (9th Cir. 2014) (citation omitted). Certainly, the public has an interest in not being exposed to false and misleading information.   The public has a right to know the truth and to not form opinions about a product or company based on false misrepresentations and unsubstantiated claims of toxicity, health hazards, and poor air

1  quality.

2       67.    Therefore, to avoid further public confusion and deception, injunctive relief is

3  necessary and warranted.

4              **V.    REQUESTED RELIEF**

5       68.    A district court has considerable discretion in fashioning suitable relief and

6  defining the terms of an injunction.  *Lamb-Weston, Inc. v. McCain Foods, Ltd*., 941 F.2d

7  970, 974 (9th Cir. 1991).  At the same time, "[i]njunctive relief, ..., must be tailored to

8  remedy the specific harm alleged." *Aviation Consumer Action Project v. Washburn*, 535

9  F.2d 101, 108 (D.C.Cir.1976); *see also Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)

10  ("[I]njunctive relief should be no more burdensome to the defendants than necessary to

11  provide complete relief to the plaintiffs").

12      69.    Here, the specific harms to be enjoined are the defamatory and falsely

13  accusatory comments, statements, and posts published and disseminated by Defendants on

14  social media, websites, and the internet.  *See* Markin Decl., ¶ 25.  Accordingly, Plaintiff's

15  requested relief is to order Defendants to remove and take down all posts, comments, and

16  videos containing false and disparaging statements and to refrain from making any further

17  statements, comments, posts, or videos about, concerning, or referencing Living Vehicle.

18  Such relief is narrowly tailored to address the specific harms incurred by Living Vehicle

19  and to preserve the status quo (pre-defamation) pending final adjudication of Plaintiff's

20  claims.

21                          **CONCLUSION**

22      For all the foregoing reasons, Plaintiff's motion for injunctive relief should be

23  granted.

24  Date: November 7, 2022              OWENS & GACH RAY

25

26                          By /s/ Robert B. Owens
                                _____
27                              Robert B. Owens
                                Attorneys for Plaintiff Living Vehicle, Inc.

28

CERTIFICATE OF SERVICE

I, the undersigned, declare as follows:

I am employed in the County of Los Angeles, State of California. I am over the age of 18 years, and not a party to the within action. I am an employee of or agent for Owens & Gach Ray, 269 S. Beverly Drive, #1074, Beverly Hills, California 90212.

I hereby certify that on November 7, 2022, I electronically filed the document entitled PLAINTIFF LIVING VEHICLES, INC.'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION with the Clerk of the Court by using the CM/ECF system. I certify that participants in the case that are registered CM/ECF users will receive service that will be accomplished by the appellate CM/ECF system.

Executed on November 7, 2022, in San Carlos, California. I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

*/s/ Catherine Lin*
Catherine Lin

PLAINTIFF LIVING VEHICLE, INC.'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION